## JOHN T. JOHNSTON

*v.*

## CHARLES G. HYDE.

1. Where the complainant is entitled to an easement of the flow of the waters of a natural stream through an artificial raceway, constructed on the lands of the defendant, which the defendant has wrongfully interfered with, a court of equity, on final hearing, may, by a mandatory injunction, compel the defendant to restore the raceway to its former condition.

2. Where, upon the construction of a deed, it appears to have been the in-tention of the parties to make a grant of a certain quantity of water measured

Johnston v. Hyde.

by an existing dam and raceway on lands of the grantor, the grantee is not bound to use the water in a particular manner, though it be mentioned in the deed that the water privileges were " for the purpose of a saw-mill." He may use the water in a different manner or in a different place, or increase the capacity of the machinery propelled by it, without affecting his rights, provided the quantity used is not increased, and the change does not prejudice the rights of others.

3. Where the grant is of a water-power, and it be left in doubt whether the kind of mill mentioned indicates the quantity of water and measures the extent of the power intended to be granted, or the grant is of water to drive a particular kind of a mill, the former construction will be favored.

4. If the right to an easement of the flow of water has been derived by grant, it may be extinguished by a possession of the servient tenement adverse to the easement for the full period of twenty years, but will not be lost by mere non-user.

5. The owner of an easement may lose his right to it by acquiescence, as where he has discontinued the use of the easement under circumstances indicating his intention to renounce it, and the owner of the servient tenement, relying on his conduct, has been induced to make expenditures in altering and improving his premises, which expenditures would be rendered useless if the owner of the easement should resume the use of it. Under such circumstances in some cases the easement has been considered in equity as extinguished, though the discontinuance of the use of it has been for a period of less than twenty years. Cases of this class depend on the doctrine of equitable estoppel.

6. In 1824, E. was the owner of a saw-mill driven by the waters of a natural stream, diverted from the stream, and carried to his mill by means of a dam and raceway on the lands of D. In May, 1824, E. conveyed to D. a moiety of the saw-mill and race, together with the equal half part or moiety of the water privileges and water courses belonging to said saw-mill, "the dam to be raised no higher than it now is, without the consent of the parties, and the said raceway to be and remain as it now stands." On the same day, D. conveyed to E. the equal undivided half part or moiety of the dam and pond situate on his lands, with the one equal moiety of water and water privileges thereto belonging, for the purpose of a saw-mill, "the dam to be raised no higher than it is at this time, without the consent of the parties." In June, 1824, D. conveyed to W. his moiety of the saw-mill and the water-courses, together with the privilege, for the said saw-mill, of the water, dam and race on his lands, "the dam to remain as it now stands     *     *     *     and the race, dam and pond to be and remain where it now stands, and not to be altered." In 1835, W. conveyed to E. the moiety of the mill and water privileges he acquired from D. The complainant and defendant, respectively, acquired title under E. and D.—*Held*,

(1) That the grant was of an easement of the right to the flow of so much of the waters of the stream as the dam then standing would divert, and to the use of the raceway as it then was, as the conduit by which the water should be carried to the mill, and also, as incident thereto, the right to cleanse and

repair the raceway and dam, and to do whatever might be necessary and proper to keep them in a condition fit for the purposes for which they were designed.

(2) That a change in the location of the water-course, and the substitution of a box aqueduct, enclosed and covered over, and of less capacity for the open raceway through the servient tenement, was an injury to the complainant's easement, for which the complainant might have relief in equity.

7. The owner of the dominant tenement has no property or rights in the servient tenement except such as are incident to the enjoyment of his easement. The owner of the servient tenement can do no act on his lands which interferes substantially with the easement, or with those rights which are essential to the full enjoyment of its benefits; but the utmost extent of the duty which rests upon the owner of the servient tenement, is not to alter its condition so as to interfere with the enjoyment of the easement. How far the owner of the servient tenement is interdicted from acts of ownership on his lands will depend upon the nature and qualities of the easement.

8. The chancellor decreed that the complainant was entitled to an easement of an open raceway through the defendant's lands, of a certain width and depth. He ordered that a box aqueduct placed therein should be removed, and the raceway should be restored to its former condition, and that the defendant should be perpetually enjoined from obstructing the complainant in the enjoyment of his easement.—*Held*, in affirming the decree,

(1) That the decree did not interdict the defendant entirely from acts of dominion over the strip of land on which the raceway was located; that the defendant might throw bridges over the raceway to connect the two parcels into which his lands were severed by the raceway, and generally might exercise over the premises such acts of ownership as would not substantially interfere with the complainant's enjoyment of his rights therein; and

(2) That when the defendant shall have obeyed the mandatory part of the decree, whether the acts he shall do in the future are an interference with the complainant's rights, is a question that will arise when the inquiry arises whether the prohibitions of the injunction have been disregarded.

On appeal from the court of chancery.

The parties are owners of adjoining tracts of land through which Green Brook, a natural water-course, flows. On the premises owned by Hyde is a mill driven by the waters of the stream diverted from the natural bed of the stream, and carried to the mill by means of a dam and raceway. The complainant's mill lot contains twelve acres of land, and is part of the premises

Johnston *v.* Hyde.

conveyed to him by Mary L. and Sarah L. Hotchkiss, on the 23d of August, 1869. North of his land, the defendant, Johnston, is the owner of the lands through which the raceway extends, up to and including the place where the dam is located. The length of the raceway on the lands of Johnston, from the dam until it reaches the lands of Hyde, is about eleven hundred feet.

In 1872, Johnston substituted for the raceway a wooden box two feet and eight inches wide, and one foot and three inches high, ten hundred and sixty feet in length, and having an effective fall of about five inches. This box was enclosed on the top and filled in on the sides with earth, and covered with soil; and over part of it Johnston constructed a macadamized road from his house to his stable.

In 1874, Hyde entered on Johnston's premises and attempted to raise the gate Johnston had placed at the mouth of the trunk near the dam. Johnston then filed a bill to enjoin Hyde from interfering with the wooden aqueduct. Hyde, after answering the bill, in May, 1875, filed a cross-bill for the purpose of ascertaining and establishing his rights in the premises.

The complainant, Hyde, in his cross-bill, states his right to be of "the easement in the said premises of said Johnston; to have the said pond kept up to the height existing in the year 1824; to have the said dam and raceway maintained in the same manner as then existing; and to have the free and unobstructed use of the said water and the power thereby to be derived, for the said mill, with the right, in addition, of entering upon the said premises upon the banks of the said raceway, and over the same, through its whole length, and to the said pond upon the premises now of the said Johnston, for the purpose of all necessary repairs, and the removal of any obstructions to the free and unobstructed fall and flow of the said water."

The prayer of the cross-bill is, that it may be decreed that the complainant is entitled to the easement of an open raceway through the premises of the defendant, leading from the pond to the mill, and to the maintenance of the pond and dam thereto annexed, so that the water in the said pond may be of the same

height at which it was on the 8th day of May, 1824; and that the said raceway shall lead said water along the same course, and be of the same depth and width as it then was; and that it may be ascertained and decreed what such average width and depth was and should be, and what should be the height of the water in the said pond; that the said box aqueduct may be decreed to be a nuisance, and may, by the decree of the court, be ordered to be abated and removed, and the said raceway, at the expense of said defendant, be returned to the condition in which it was at the date aforesaid, and that the defendant may be perpetually enjoined from continuing, by means of said box aqueduct, the gate therein, or otherwise, any obstruction to the full and free enjoyment by the complainant of his said easement, or to his coming upon the premises of defendant to repair or clean out said raceway, or abate any nuisance, accidental or otherwise, to his rights in the premises, or prevent any obstruction to his enjoyment of said easement.

The chancellor, upon final hearing upon the pleadings and proofs, dismissed the original bill, and, upon the cross-bill, made a decree that the complainant therein was entitled to the right and easement in the defendant's lands of an open raceway through the same, leading from the pond to the mill of the complainant, and to the maintenance of the said pond, and the dam thereto annexed, so that the water should be kept at the same height that it was on the 8th of May, 1824; that the raceway should lead along the same course, and be of the same depth and width as it then was; and that the average width of the said raceway shall be fourteen feet at the top and nine feet at the bottom, and the average depth four feet; and that the height of the water in said pond should be four feet. The decree further declared that the box aqueduct was unlawful, and directed that it should be abated and removed, and that the raceway should be restored to the condition in which it was in May, 1875, when the cross-bill was filed; and that Johnston and all parties to claim under him be perpetually enjoined from continuing, by means of said box aqueduct, the gate therein, or otherwise, any obstruction to the full and free enjoyment by the said Hyde of

his said easement, or to his coming upon the premises of the said Johnston to repair or clean out the same, or to abate any nuisance, accidental or otherwise, to his said rights in the premises, or to prevent any obstruction to his enjoyment of said easement.

From this decree Johnston has appealed.

*Mr. R. W. De Forest* and *Mr. B. Williamson*, for appellants.

*Mr. J. B. Coward* and *Mr. C. Parker*, *contra.*

The opinion of the court was delivered by

DEPUE, J.

Prior to 1824 there was a mill on the complainant's premises, on the site of the present structure, which was driven by the waters of the stream, diverted therefrom by means of a dam, and conveyed to the mill through an open raceway. The dam and raceway, at that time, were located on or near the site of the dam and raceway as they were when the defendant began his improvements in 1872.

In 1824, Elijah Shotwell was the owner of the mill, and of the tract of land on which it was situate, which then contained forty-one and ninty-three hundredths acres. Next to this tract on the north was a tract of land containing thirty-one and sixty-five hundredths acres, owned by Daniel Shotwell. The dam was on the last-mentioned tract, as was also so much of the raceway as extended to the line of Elijah Shotwell's lands.

Elijah Shotwell acquired title to the tract of forty-one and ninty-three hundredths acres in 1809, by conveyance from Elijah Pound. Daniel Shotwell acquired his title to the tract of thirty-one and sixty-five hundredths acres in 1822, by conveyance from Asa F. Randolph. By a deed bearing date on the 8th day of May, 1824, Elijah Shotwell made a conveyance in fee to Daniel Shotwell, in which the premises conveyed are described as "all that one equal half of a tract or parcel of land and premises, being the one equal half part or moiety of a saw-mill and race, together with the one equal half part or moiety of the

water privileges and water-courses belonging to said saw-mill, erected on the said Elijah Shotwell, with the privilege of a walk on the race-bank to said saw-mill from the dam that is erected for the said saw-mill as it now stands; the dam to be raised no higher than it now is, without the consent of the parties, and the said race to be and remain as it now stands."

By a deed bearing date on the same 8th day of May, 1824, Daniel Shotwell made a conveyance to Elijah Shotwell of premises described as "all that equal half of a tract or parcel of land and premises, being the one equal, undivided half part or moiety of the dam and pond erected on the said Daniel Shotwell, together with the one equal moiety of the water and water privileges thereunto belonging, situated on Green Brook, for the purpose of a saw-mill erected on the said Elijah Shotwell, as it now stands, the dam to be raised no higher than it is at this time without the consent of the parties."

By these two conveyances of May 8th, 1824, Elijah and Daniel became joint owners of the mill and of the water privileges, including the pond, dam and raceway—each continuing to be the owner in severalty of the adjacent lands. On the 23d of June, 1824, Daniel conveyed his moiety of the mill, with its water privileges, to William B. Shotwell, who in turn, by a deed dated December 10th, 1835, conveyed the same to Elijah, who thus became the owner in severalty of the mill and its water privileges. Elijah was then the owner of the tract of forty-one and ninety-three hundredths acres, which he purchased of Pound in 1809, including the mill, with such water privileges as were granted by the deeds of May 8th, 1824. In the deed from Daniel to William P. Shotwell, made in June, 1824, for his moiety of the mill, there is an express grant of "all the water-courses, together with all the privileges of the race above and the race below, that the said Daniel Shotwell is possessed of, the lands of the said Daniel Shotwell and Nathan Vail, and also the privileges for the said saw-mill, of the water, dam and race on the lands that the said Daniel Shotwell purchased of Asa F. Randolph, * * * and the dam to remain as it now stands, * * * and the race, dam and pond to be and remain where it now stands, and not to be altered."

The complainant, when this bill was filed, was the owner of twelve acres of the tract of forty-one and ninety-three hundredths acres, including the mill and its water rights, having acquired his title by divers mesne conveyances from Elijah. The defendant is the owner of the residue of the tract of forty-one and ninety-three hundredths acres owned by Elijah in 1824, and also of the tract of thirty-one and sixty-five hundredths acres owned by Daniel at that time. He acquired title to these two tracts in different parcels at several times, by divers mesne conveyances. The dam and about two hundred feet of the raceway are on the tract of thirty-one and sixty-five hundredths acres which was owned by Daniel in 1824. The rest of the raceway, until it reaches the complainant's lands, lies upon that part of the tract of forty-one and ninety-three hundredths acres which defendant owns by a title derived from Elijah.

In view of the claim of right in the bill, and the prayer for relief, I do not deem it necessary to refer to the provisions on this subject contained in the intermediate title deeds of the parties. The case made in the bill, the prayer for relief and the decree of the chancellor are based upon the condition of things in 1824. If the complainant acquired greater rights in parts of the defendant's land by the intermediate deeds of conveyance, such rights are not within the right claimed in his bill or within the prayer for relief.

It should, however, be remarked that, in the claim of title of the parties from Elijah and Daniel Shotwell, the water rights and privileges, as they existed in 1824, are preserved by recitals and reservations contained in the intermediate deeds of conveyance. Indeed, it is not disputed that the complainant acquired, by his deed from the Hotchkisses in 1869, the right to the use of the waters of the stream as they had been used theretofore; nor is the right of the complainant to have the dam and its pondage maintained at their present height denied. The contention of the defendant is, first, that Hyde is not entitled to any relief on his cross-bill, and that, if he has succeeded in the suit, he is only entitled to a dissolution of the injunction granted on the original bill; second, that he has abandoned or lost his ease-

ment by non-user or by the appropriation of the water to another and a different use from that to which it was limited; third, that he is concluded from the relief sought by the cross-bill by an equitable estoppel arising from his acquiescence in expenditures and improvements made by Johnston; fourth, that if he is entitled to any relief other than a dissolution of the injunction granted upon the original bill, he is only entitled, under the pleadings and proofs, to have the water conveyed from the dam across the lands of Johnston by a viaduct of sufficient capacity to permit the flow of so much water as he is entitled to have from the stream, and that he has no grounds for complaint if such a viaduct has, in fact, been constructed, to be maintained by said Johnston at his own expense. The defendant insists that, as the owner of the servient tenement he may provide for the transmission of the water through his lands in such a manner and by means of such contrivances as may be advantageous to his interest, provided he does not impede the flow or diminish the quantity of the water, if he assumes the burden of constructing and keeping in repair the aqueduct by which that result shall be effected. In the brief of counsel, a commission is asked for to ascertain the necessary facts for a decree of the import just mentioned.

The right of the complainant to the flow of the water, independent of the equitable defences interposed by the defendant, being undisputed, the jurisdiction of a court of equity in the premises is too well settled to be a matter of contention. Under such circumstances, a court of equity may, by preliminary injunction, interpose to prevent the threatened injury, and on final hearing may, by a mandatory injunction, compel the restoration of the premises to the condition in which they were before the complainant's rights were interfered with. In such a case, a mandatory injunction is nothing more than a means of executing the judgment or decree of the court, and is necessary to carry its decree into execution. *Rogers Locomotive Works* v. *Erie Railway Co.*, *5 C. E. Gr. 379;* *Carlisle* v. *Cooper*, *6 Id. 576;* *Belknap* v. *Trimble*, *3 Paige 577;* *Corning* v. *Troy Iron Co.*,

Johnston *v.* Hyde.

*40 N. Y. 191; Kerr on Injunctions 231; Coulson & Forbes on
Waters 666.*

Before 1824 the mill on the complainant's premises was used
as a saw-mill.   In the deeds of 1824 the mill is called a saw-
mill; and in the deed from Daniel to Elijah the water privileges
are described as being " for the purpose of a saw-mill."

In *Luttrell's case, 4 Coke ( Vol. 2 part 4) 86,* the plaintiff declared
that, *4 Martii, 40 Eliz.,* he was seized in fee of two old and ruinous
fulling-mills, and that from time immemorial *magna pars aquœ
cujusdam rivuli* ran from a place called Head Wear to said mills,
and that afterwards he pulled down the said mills and erected
two mills to grind corn, and that the defendant broke the bank
and diverted the water from his mills.   The defendant claimed
that the plaintiff, in tearing down the old fulling-mills, and
building the new mills, had destroyed his prescription, and could
not prescribe for a water-course to the grist-mills.   But it was
resolved that mill was the substance and thing demanded, and
the addition of grist or fulling was but to show the quality of
the mill, and that the plaintiff might alter the mill into whatever
nature of a mill he pleased, provided no prejudice should arise
thereby, either by diverting or stopping the water as it was before.
Ever since Luttrell's case it has been considered settled law that,
when the easement is of a certain quantity of water, the owner
is not bound to use it in a particular manner, though the pur-
pose for which it is used be mentioned in the grant.   He may
use the water in a different manner or at a different place, or in-
crease the capacity of the machinery which is propelled by it,
without affecting his right, provided the quantity used is not in-
creased and the change does not prejudice the rights of others.
*Saunders* v. *Newman, 1 B. & Ald. 258; Hall* v. *Oldroyd, 14
M. & W. 789; Watts* v. *Kelson, L. R. (6 Ch.) 166; Casler* v.
*Shipman, 35 N. Y. 533; Carlisle* v. *Cooper, 6 C. E. Gr. 595.*

It is manifest that the grant contained in the deeds of 1824 is
a grant of a certain quantity of water.   The call for the dam at
its then present height, and for the raceway as it then was,
makes it apparent that such was the purpose of the parties.

41

When the grant is of a water-power, and it be left in doubt whether the kind of mill mentioned indicates the quantity of water, and measures the extent of the power intended to be conveyed, or the grant is of water to drive a particular kind of mill, the former construction will be favored, because it is most favorable to the grantee without being more onerous to the grantor. *Ashley* v. *Pond, 18 Pick. 268.* Grants referring to the purpose for which the water is to be used in much more specific and precise terms than those now under consideration have been held to be grants of a certain quantity of water for unlimited use as a water-power, and not grants of water to be used for the specified purpose only. *Cromwell* v. *Seldon, 3 Comst. 253; Borst* v. *Empie, 1 Seld. 33; Olmstead* v. *Loomis, 5 Id. 423; Prall* v. *Lamson, 2 Allen 275; Angell on Water-Courses,* §§*149 a* to *149 h.* The mill has at times since 1824 been used for manufacturing purposes of different kinds, and at one time the power needed was obtained by using a steam engine in addition to the water-power. But for none of these uses was more water used or obtained than was supplied by the dam and water-power as it was in 1824.

Nor has the complainant lost his right to the water by a cesser of use. Mere non-user of a prescriptive right will not destroy the right unless there be evidence of an intention to abandon it. *Crossley* v. *Lightowler, L. R. (2 Ch.) 478.* If the right has been derived by grant, it may be extinguished by possession of the servient tenement adverse to the easement for the full period of twenty years, but will not be lost by mere non-user. *Carlisle* v. *Cooper, 4 C. E. Gr. 256; Stilwell* v. *Horner, 6 Vr. 307; Townshend* v. *McDonald, 2 Kern 381; Smyles* v. *Hasling, 22 N. Y. 217; Arnold* v. *Stevens, 24 Pick. 106; Ower* v. *Field, 102 Mass. 91–114; Goddard on Ease. (Bennett's ed.) 464.* The mill has been in general use since 1824. At times the raceway has been dilapidated, and for about one year the mill lay idle, by reason of a disagreement between the complainant and his tenants.

There are cases in which the owner of an easement has been considered as having lost his easement by acquiescence, as where

Johnston v. Hyde.

he has discontinued the use of the easement under circumstances indicating his intention to renounce it, and the owner of the servient tenement, relying on his conduct, has been induced to make expenditures, in altering and improving his premises, which expenditures would be made useless if the owner of the easement should resume the use of it. Under such circumstances, in some cases, the easement has in equity been considered as extinguished, though the discontinuance of the use of it has been for a period less than twenty years. *Davies* v. *Marshall, 10 C. B. (N. S.) 697; Stokoe* v. *Singers, 8 E. & B. 31; Liggins* v. *Inge, 7 Bing. 682; Morse* v. *Copeland, 2 Gray 302; Raritan Water Power Co.* v. *Veghte, 6 C. E. Gr. 463; Case of the Water-Courses, 2 Eq. Cas. Abr. 522; Williams* v. *Earl of Jersey, 1 Cr. & Ph. 91; Duke of Devonshire* v. *Eglin, 14 Beav. 530; Haight* v. *Proprietors, 4 Wash. C. C. 601; M. & E. R. R. Co.* v. *Pruden, 5 C. E. Gr. 531; 2 Am. Lead. Cas. 579; Coulson & Forbes on Waters 208.* Cases of this class depend upon the doctrine of an equitable estoppel.

There are no facts in this case upon which it can be held that the complainant's easement has been extinguished by an adverse possession, or that the complainant is concluded from the right to the use of the easement by an equitable estoppel. If the doctrine of equitable estoppel has any application in this case, it will be when we come to consider whether or not the complainant has disentitled himself to any other right than to have the water delivered to him on his premises in the manner in which the defendant has made provision for its delivery.

Having reached the conclusion above indicated, with respect to the equitable defences interposed by the defendant, I turn now to the consideration of the nature and extent of the complainant's rights, and the relief he is entitled to on his cross-bill.

The complainant founds his right to an easement in the defendant's lands upon an express grant. The question is, therefore, one of construction only.

Speaking generally with reference to the subject matter of the grant, it is a grant of a water-course. A grant of a water-course may mean either the easement of the right to the flow of water,

or it may mean the channel pipe or drain which contains the water, or the land over which it flows; and if the context does not show an intention to make a different grant, it will mean an easement of the right to the flow of the water. *Taylor* v. *Corp. of St. Helen's, 6 Ch. Div. 271–7.* A grant of "a water-course flowing or descending from a head weir * * in and through a meadow, * * and from thence conveyed by a trough into a meadow," is not a grant of the soil of the channel, but subjects the channel to an easement of the flow of water through the channel. *Doe* v. *Williams, 11 Q. B. 688–700.* The use of an artificial channel over the lands of another, through which the waters of a natural stream have flowed for the prescriptive period, will give an easement of the right to the flow of the water through that channel, and the right to sue for the interruption of that easement. *Beestone* v. *Waite, 5 E. & B. 985–995.* In *Wortham* v. *Hurley, 1 E. & B. 665,* the grant, which was by a deed, was of the waters of a natural stream, to be allowed to flow in a free, uninterrupted course, through a designated channel which had been artificially constructed over the lands of the grantor, with a covenant by the grantee to keep the channel in repair and properly scoured; and it was adjudged that, inasmuch as the channel was specified, and the right was given to enter and clean the channel, the grant operated as a grant of the easement of the water-course therein described, and that a change of the channel on the servient tenement would be an injury to the right. The defendant insisted that the water, though diverted from a part of the channel, was restored to it at a lower spot, so that, in effect, the plaintiff had the full use of the water; but it was the opinion of the court that the deed operated as a grant of the easement of a water-course therein described, and that the grantee acquired a right in respect of that channel such as that a change in the channel was an injury to the right for which he might sue, though he had, in fact, sustained no actual damage.

In *Johnson* v. *Jacqui, 10 C. E. Gr.; 11 Id. 321; 12 Id. 552,* the owner of the dominant tenement had obtained a grant by deed from the owner of the servient tenement, of the

Johnston v. Hyde.

right to take the water from a pond of the latter, across his lands, "as now carried in the trunk or feeder that carries the water from said pond to the grist-mill pond" &c. By the widening of a highway the trunk came within the lines of the public road, and the owner of the easement proposed to renew the trunk, and, in part, change its location on the land of the grantor. He was enjoined from making any alteration in the location of the trunk, although the deed expressly granted him the right to enter upon the lands of the grantor "along and adjoining said trunk or feeder, to alter, repair or renew the same at his convenience." This court held that the deed created an easement of an artificial water-way on a defined line over the servient tenement, which could not be changed to other lands of the owner of the servient tenement without his consent. The case cited is an authority for the one in hand, for it was decided in a construction of a deed of grant, which is applicable to both the owner of the easement and the owner of the servient tenement, and it was so considered by Mr. Justice Knapp in his opinion in this court. *12 C. E. Gr.* *555.*

The raceway was in existence and in use when the deeds of 1824 were made. So far back as the testimony has gone (upwards of thirty years), the raceway is described as an open raceway. The evidence raises no doubt that it was such in 1824. The deeds of that date are to be construed in reference to the state and condition of the premises at that time. *Hall* v. *Lund, 1 H. & C. 676.* They establish the height of the dam as it then was, and provide for the maintenance of the raceway as it then *stood,* with the privilege of a walk on the race-bank from the saw-mill to the dam—"the said race, dam and pond to remain where they now *stand,* and not to be altered." On the construction of these deeds it is clear that the grant was of an easement of the right to the flow of so much of the water of the stream as the dam then standing would divert, and of the use of the raceway, as it then was, as the conduit by which the water should be carried to the mill. Incident to the rights granted is the right to enter on the lands of the grantor to cleanse and repair the raceway and dam, and to do whatever might be necessary and proper to

keep them in a condition fit for the purposes for which they were designed.    *Pomfret* v. *Recroft, 1 Wms. Saund. 323; Prescott* v. *Waite, 21 Pick. 341; Goddard on Ease. 285.*    The easement is a unit, consisting of the right to the flow of water and of the use of the raceway, and the right to enter to scour and repair. *Peter* v. *Daniel, 5 C. B. 567; Coulson & Forbes on Waters 229.*

For this easement the defendant proposes to substitute another and a different easement, consisting of the right to the same flow of water carried over his lands by contrivances devised and constructed by himself, and to be maintained at his own expense— substituting an enclosed and covered culvert, of less capacity, for an open raceway; and his obligation to amend and keep in repair in the place of the right of the owner of the easement to enter and make repairs whensoever they may be necessary. The change is one that materially affects the rights of the owner of the easement, and cannot be made without the consent of the latter.

On this head the defendant contends that the complainant has waived his legal rights by acquiescence in the alterations and improvements made by the defendant. The proof is that the defendant began his improvements in 1872, in which he has expended $6,000, of which $1,000 was expended in the construction of the wooden aqueduct. But there is no evidence that the defendant was induced to incur this expenditure on the faith of the abandonment, by the complainant, of his water rights and privileges as they had been enjoyed since 1824. On the contrary, it is quite clear from the evidence that the defendant knew that the complainant insisted on his rights as he had previously enjoyed them, and that he gave no consent to the proposed alterations. Under such circumstances there is no ground on which an equitable estoppel can be rested, or on which he can be compelled to accept an enclosed culvert of the proposed dimensions in the place of an open raceway.

Nor is the complainant concluded from insisting on his right to such a raceway as he is entitled to through the defendant's lands, by the action of the public authorities in laying and opening Farragut avenue over the raceway. In addition to the reasons assigned by the chancellor for considering the condition

Johnston *v.* Hyde.

of the raceway under the avenue as no impediment in the way of the relief sought, it may be added that the defendant cannot justify under the action of the public authorities. If the public has infringed on the complainant's rights, he may have his redress against the public authorities, if no compensation has been made to him for the injury suffered.

The chancellor held that the complainant was entitled to an easement of an open raceway through the defendant's lands, along the same course, and of the same width and depth, as it was in 1824. He ascertained its average width to be fourteen feet at the top and nine feet at the bottom, and its average depth to be four feet. He decreed the box aqueduct constructed by the defendant to be unlawful, and ordered that it should be removed, and that the raceway should be restored to its former condition at the defendant's expense, and that the complainant should be protected in the enjoyment of his easement by a perpetual injunction. I think his decree should be affirmed.

Some criticism was made, on the argument, upon the language of that part of the decree which adjudged that the complainant is entitled to " an easement of an open raceway." It was said that the decree gives to the complainant absolute and entire dominion over the strip of land on which the raceway is located, and that the defendant is excluded from all right in that part of his lands. I do not so understand the import and legal effect of the decree.

The decree adjudges that the complainant is entitled to an easement, which, in legal signification, imports an interest in the lands—the ownership of which is in another—an incorporeal hereditament, consisting of the right to use the lands of another for the purposes for which the easement was created, with the privilege of doing on the servient tenement such acts as are essential to the enjoyment of the easement itself. The owner of the land over which the easement extends, so far as the easement is capable of being exercised, is deprived of an incident of property, and the owner of the easement acquires by it, just to the same extent, an interest in the land itself. *Phear on Waters 58.* Considered with regard to the servient tenement, an easement is

but a change or obligation curtailing the ordinary rights of property (*Gale on Ease. 6*), which remain in the owner of the lands subject to the enjoyment of the easement. *Wash. on Ease. 227*.

The owner of the dominant tenement has no property or rights in the servient tenement except such as are incident to the enjoyment of his easement. So strictly is this principle adhered to, that when the owner of an easement of a water-course exercises the right to cleanse the channel through the servient tenement, his right to remove the materials taken out will depend upon the circumstance whether they are or are not useful or beneficial to the owner of the soil; and if he does remove them, it is his duty to do so in a reasonable time and in a manner least prejudicial to the owner of the land. *Prescott* v. *White, 21 Pick. 341.*

On the other hand, the owner of the servient tenement can do no act on his lands which interferes, substantially, with the easement, or with those rights which are requisite to the full enjoyment of its benefits; but the utmost extent of the duty which rests on the owner of the servient tenement is not to alter its condition so as to interfere with the enjoyment of the easement. *Gale on Ease. 7, 339.* How far the owner of the servient tenement is interdicted from acts of ownership on his lands, will depend on the nature and qualities of the easement. The owner of land over which the grantor has reserved a passage-way " for carrying and recarrying wood and any other thing through the same," may lawfully cover the same with a building, if he leave a space so wide, high and light that the way is substantially as convenient as before, for the purposes for which it was reserved. *Atkins* v. *Boardman, 2 Metc. 457.* But when tenants in common made partition of their lands, except a certain passage-way or court, called Central Court, and covenanted that the part not set off in the partition should " be left, and always lie open for the passage-way or court aforesaid, for the common use and benefit of both the said parties and their respective estates," it was held that the parties had not only a right of way, but also a right to have the whole court open for light and air; and a

Johnston *v.* Hyde.

bridge over the court, connecting the buildings on each side, which seriously incommoded the one party, was enjoined. *Salisbury* v. *Andrews, 128 Mass. 336.*

In one sense an open raceway is essential to the enjoyment of the complainant's rights; but it cannot be imagined that a raceway open *usque ad cœlum,* and throughout the entire length of the raceway, is necessary to that end. The easement of the complainant is of the right to the flow of the water through the channel, with the right to keep up and maintain the banks of the raceway, and to scour and cleanse the same when necessary. The box aqueduct which the defendant placed in the raceway was a plain invasion of the complainant's rights, and the chancellor decreed that it should be removed. The chancellor, also, by an injunction, in general terms, perpetually enjoined the defendant from obstructing the full and free enjoyment by the complainant of his easement, and of his right to cleanse and repair; but he did not determine, in advance, what acts of the defendant in the future would be a violation of the complainant's rights. The defendant may throw bridges over the raceway to connect the two parcels into which his lands are severed by the raceway, in such a manner as not to impair the complainant's rights, and generally may exercise over the premises such acts of ownership as do not substantially interfere with the enjoyment by the complainant of his rights therein. Such acts are the incidents of his title as the owner of his lands, and have not been surrendered to the complainant. Whether the acts he shall do in the future, when he shall have obeyed the mandatory part of the decree, are substantially an interference with the complainant's rights, is a question which will arise when the inquiry arises whether the prohibitions of the injunction have been disregarded.

The decree should be affirmed, with costs.

*Decree unanimously affirmed.*